No. 24-1809

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

ROY PAYAN, *et al.*,

*Plaintiffs-Appellants*,

v.

LOS ANGELES COMMUNITY COLLEGE DISTRICT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:17-CV-01697-SVW-SK
Hon. Stephen V. Wilson

_____

## APPELLANTS' OPENING BRIEF

_____

Jessica P. Weber
Kevin D. Docherty
Monica R. Basche
BROWN, GOLDSTEIN &
LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
jweber@browngold.com
kdocherty@browngold.com
mbasche@browngold.com

Patricia Barbosa
BARBOSA GROUP
606 Lake St. No. 9
Huntington Beach, California 92648
pbarbosa@barbosagrp.com

*Counsel for Plaintiffs-Appellants*

# DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rules 26.1 and 28, I hereby certify that the National Federation of the Blind, Inc., and National Federation of the Blind of California are non-profit corporations that have no parent corporations and that no publicly held corporation owns 10% or more of their stock.

/s/ Jessica P. Weber
Jessica P. Weber
Kevin D. Docherty
Monica R. Basche
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
jweber@browngold.com
kdocherty@browngold.com
mbasche@browngold.com

Patricia Barbosa
BARBOSA GROUP
606 Lake St. No. 9
Huntington Beach, California 92648
pbarbosa@barbosagrp.com

*Counsel for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS...................................................................... i

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .......................................................3

ISSUES PRESENTED........................................................................4

STATEMENT OF THE CASE...............................................................4

I.    Procedural History ....................................................................4

II.    Facts ......................................................................................8

SUMMARY OF ARGUMENT ...........................................................16

ARGUMENT .................................................................................18

I.    Standards of review. ...............................................................18

II.    The district court erred in reducing Plaintiffs' damages award. ...................19

    A.    LACCD forfeited its argument against emotional distress damages. ..................................................................19

    B.    Emotional distress damages are available under the ADA.................23

    C.    The jury's damages award was based on ample evidence of lost educational opportunities and was consistent with the court's instructions. .......................................................30

        1.    Lost educational opportunities are compensable under Title II.....................................................31

        2.    Plaintiffs presented evidence of lost educational opportunities................................................32

        3.    Plaintiffs were not required to assign an economic value to their lost opportunities. .........................................36

       4.      The jury followed the district court's instructions...................39

III.   The district court's narrow injunction undermines the jury's findings and ignores the evidence.................................................................42

      A.     The district court offered no explanation for failing to require the timely provision of accessible course materials............................44

      B.     The district court erred by refusing to remedy problems implicit in the jury's findings. .........................................................................45

      C.     The district court improperly relied on LACCD's litigation-motivated changes and its finding—contrary to undisputed expert evidence—that LACCD is now "vigilant to its ADA responsibilities."........................................................................48

      D.     The district court erroneously deemed certain ADA violations isolated incidents when the evidence showed otherwise. ..................54

      E.     The district court improperly minimized the substantial findings of ADA violations in refusing to order robust training, assistance, and accountability measures to ensure future ADA compliance..............................................................................56

CONCLUSION.................................................................................................61

CERTIFICATE OF COMPLIANCE....................................................................63

ADDENDUM ...............................................................................................Add. 1

# TABLE OF AUTHORITIES

## Cases

*A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*,
  110 F.4th 1309 (11th Cir. 2024) ........................................ 26, 29, 32, 33

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405 (1975) ........................................................................ 59

*Allen v. Koenigsmann*,
  No. 19-CV-8173 (LAP), 2023 WL 8113230
  (S.D.N.Y. Nov. 22, 2023) ............................................................ 48, 49

*Armstrong v. Newsom*,
  58 F.4th 1283 (9th Cir. 2023) ....................................................... 57, 60

*Armstrong v. Schwarzenegger*,
  622 F.3d 1058 (9th Cir. 2010) ............................................................. 59

*Asfall v. Los Angeles Unified School District*,
  No. 20-55599, 2022 WL 2764747 (9th Cir. July 15, 2022) .................................. 21

*Barnes v. Gorman*,
  536 U.S. 181 (2002) ................................................................. *passim*

*Barrett v. Maciol*,
  20-CV-537 (MAD/DJS), 2022 WL 130878
  (N.D.N.Y. Jan. 14, 2022) ................................................................. 49

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017) ............................................................. 59

*Bell v. Hood*,
  327 U.S. 678 (1946) ...................................................................... 32

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987) ....................................................... 62, 63

*Brown v. GSA*,
  425 U.S. 820 (1976) ...................................................................... 26

*Burton v. Armontrout*,
975 F.2d 543 (8th Cir. 1992) ................................................................47

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................... 43, 61

*Chaitram v. Penn Medicine-Princeton Med. Ctr.*,
No. 21-17583, 2022 WL 16821692 (D.N.J. Nov. 8, 2022) ................................32

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011) ...............................................................60

*Cole v. City of Memphis*,
108 F. Supp. 3d 593 (W.D. Tenn. 2015) ....................................................48

*Cole v. City of Memphis*,
839 F.3d 530 (6th Cir. 2016) ...............................................................49

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) .............................................................20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ................................................................ *passim*

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
95 F.3d 1422 (9th Cir. 1996) ........................................................ 31, 32

*Doe by Gonzales v. Maher*,
793 F.2d 1470 (9th Cir. 1986) .............................................................62

*Doe v. Fairfax Cnty. Sch. Bd.*,
No. 1:18-cv-00614-MSN-ID, 2023 WL 424265
(E.D. Va. Jan. 25, 2023) ......................................................... 32, 33, 38

*Doe v. Univ. of Mississippi*,
No. 3:18-CV-138-DPJ-ASH, 2024 WL 3011133
(S.D. Miss. June 14, 2024) ....................................................... 32, 33, 38

*Doherty v. Bice*,
101 F.4th 169 (2d Cir. 2024) ...................................................... 26, 29

*Duk v. MGM Grand Hotel, Inc.*,
320 F.3d 1052 (9th Cir. 2003) .............................................................42

*Escriba v. Foster Poultry Farms, Inc.*,
  743 F.3d 1236 (9th Cir. 2014) .............................................................40

*Franklin v. Gwinnett County Public Schools*,
  503 U.S. 60 (1992) ..................................................... *passim*

*Gallick v. Baltimore & Ohio R.R. Co.*,
  372 U.S. 108 (1963) ................................................................42

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ................................................................39

*Greater Los Angeles Council on Deafness, Inc. v. Zolin*,
  812 F.2d 1103 (9th Cir. 1987) ...............................................28

*Grosvenor Properties, Ltd. v. Southmark Corp.*,
  896 F.2d 1149 (9th Cir. 1990) ...............................................43

*Guerra v. West Los Angeles College*,
  No. CV 16-6796-MWF(KSX), 2024 WL 3582320
  (C.D. Cal. July 30, 2024)........................................... 52, 62, 63

*Hason v. Med. Bd. of California*,
  279 F.3d 1167 (9th Cir. 2002) ...............................................27

*Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*,
  No. 13-CV-02862-JST, 2017 WL 3382316 (N.D. Cal. Aug. 7, 2017),
  *aff'd*, 743 F. App'x 843 (9th Cir. 2018) ................................31

*Honig v. Doe*,
  484 U.S. 305 (1988) ................................................................62

*Hous. Works, Inc. v. Turner*,
  No. 00CIV.1122, 2004 WL 2101900 (S.D.N.Y. Sept. 15, 2004) .......................39

*Hoyle v. Ada Cnty.*,
  501 F.3d 1053 (9th Cir. 2007) ...............................................42

*Huezo v. Los Angeles Community College District*,
  672 F. Supp. 2d 1045 (C.D. Cal. 2008)................................. 51, 62, 63

*King v. Burwell*,
  576 U.S. 473 (2015) ................................................................28

v

*Kirola v. City & Cnty. of San Francisco*,
  No. 21-15621, 2023 WL 2851368 (9th Cir. Apr. 10, 2023) ...............................59

*Lorillard, Div. of Loew's Theatres, Inc. v. Pons*,
  434 U.S. 575 (1978) ....................................................................................27

*Los Angeles Memorial Coliseum Comm'n v. NFL*,
  791 F.2d 1356 (9th Cir. 1986), *aff'd*, 526 U.S. 687 (1999) ...............................31

*Luna Perez v. Sturgis Pub. Sch.*,
  598 U.S. 142 (2023) ....................................................................................30

*McBride v. Michigan Dep't of Corr.*,
  294 F. Supp. 3d 695 (E.D. Mich. 2018) .........................................................48

*McGowan v. S. Methodist Univ.*,
  715 F. Supp. 3d 937 (N.D. Tex. Feb. 5, 2024) ............................................ 32, 33

*Melendres v. Skinner*,
  113 F.4th 1126 (9th Cir. 2024) .....................................................................61

*Monroe v. Meeks*,
  584 F. Supp. 3d 643 (S.D. Ill. 2022) ..............................................................48

*Montgomery v. D.C.*,
  No. 18-1928, 2022 WL 1618741 (D.D.C. May 23, 2022) ........................... 32, 33

*Mueller v. Dep't of Pub. Safety*,
  595 F. Supp. 3d 920 (D. Haw. 2022) ..............................................................39

*Newport v. Fact Concerts, Inc.*,
  453 U.S. 247 (1981) ................................................................................ 29, 30

*Payan v. Los Angeles Cmty. Coll. Dist.*,
  11 F.4th 729 (9th Cir. 2021)......................................................................5, 22

*Payan v. Los Angeles Cmty. Coll. Dist.*,
  Nos. 19-56111, 19-56146, 2021 WL 3743307
  (9th Cir. Aug. 24, 2021) ............................................................................6, 22

*Pickern v. Holiday Quality Foods Inc.*,
  293 F.3d 1133 (9th Cir. 2002)......................................................................59

*Plata v. Schwarzenegger*,
  603 F.3d 1088 (9th Cir. 2010) ...............................................................61

*Robinson v. Kramer*,
  588 F.3d 1212 (9th Cir. 2009) ...............................................................21

*S.C. v. Metro. Gov't of Nashville*,
  86 F.4th 707 (6th Cir. 2023) ..................................................................21

*S.E.C. v. Koracorp Indus., Inc.*,
  575 F.2d 692 (9th Cir. 1978) ..................................................................51

*Salazar v. Buono*,
  559 U.S. 700 (2010) ...............................................................................43

*Smith v. Kmart Corp.*,
  177 F.3d 19 (1st Cir. 1999) .....................................................................31

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
  402 U.S. 1 (1971) .............................................................................49, 58

*Tcherepnin v. Knight*,
  389 U.S. 332 (1967) ...............................................................................27

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ...............................................................................25

*Teutscher v. Woodson*,
  835 F.3d 936 (9th Cir. 2016) ..................................................................47

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) ................................................................22

*U.S. v. Heredia*,
  483 F.3d at 913 (9th Cir. 2007) ..............................................................40

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
  52 F.4th 1054 (9th Cir. 2022) .................................................................19

*United States v. Doe*,
  842 F.3d 1117 (9th Cir. 2016) ................................................................40

*United States v. Laerdal Mfg. Corp.*,
  73 F.3d 852 (9th Cir. 1995)..................................................................58

*United States v. Odessa Union Warehouse Co-op*,
  833 F.2d 172 (9th Cir. 1987)...............................................................51

*United States v. Oregon State Med. Soc.*,
  343 U.S. 326 (1952) ............................................................................50

*United States v. Ruiz*,
  462 F.3d 1082 (9th Cir. 2006)..............................................................40

*Wade v. Univ. Med. Ctr. of S. Nevada*,
  No. 2:18-CV-1927-RFB-EJY, 2023 WL 9598746
  (D. Nev. Feb. 13, 2023) ......................................................................32

*Walker v. Endell,*
  850 F.2d 470 (9th Cir. 1987).................................................................40

*Wallis v. Princess Cruises, Inc.*,
  306 F.3d 827 (9th Cir. 2002)...............................................................19

**Statutes**

18 U.S.C. § 3626..................................................................................49

28 U.S.C. § 1331....................................................................................3

28 U.S.C. § 1343....................................................................................3

42 U.S.C. § 12101......................................................................... 25, 28

42 U.S.C. § 12131....................................................................................1

42 U.S.C. § 12133.................................................................................25

**Rules**

Fed. R. App. P. 4 ....................................................................................3

Fed. R. Civ. P. 65 .................................................................................46

**Regulations**

28 C.F.R. Pt. 35, App. A ...................................................27

**Other Authorities**

Br. for the Resp'ts., *Luna Perez v. Sturgis Pub. Sch.*,
   598 U.S. 142 (2023) (No. 21-887) ....................................30

H.R. Rep. No. 101-485 (III) (1990).........................................27

Tr. of Oral Arg., *Luna Perez v. Sturgis.*, No. 21-887 (U.S. Jan. 18, 2023),
   https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022
   /21-887_b81g.pdf ....................................................31

**INTRODUCTION**

More than six years after they filed this lawsuit, Plaintiffs-Appellants Roy Payan, Portia Mason, the National Federation of the Blind ("NFB"), and the National Federation of the Blind of California ("NFB of California"),[1] finally received the jury trial they were entitled to. Over four days in May 2023, the jury heard how the Los Angeles Community College District ("LACCD") denied Mr. Payan and Ms. Mason an equal educational experience because they are blind. Mr. Payan and Ms. Mason testified at length about how LACCD deprived them of educational opportunities, rendering them spectators to, rather than participants in, the college experience.

After deliberating, the jury found that LACCD violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, in fourteen different ways and did so intentionally for nine of those violations. It awarded Mr. Payan $218,500 in damages and Ms. Mason $24,000.

But the district court refused to let the jury's damages award stand. In February 2024, the district court granted LACCD's motion for remittitur and drastically reduced Mr. Payan's damages award to just $1,650 and eliminated Ms. Mason's entirely. In doing so, the district court committed three distinct errors. First, it improperly entertained LACCD's argument that Plaintiffs could not seek

_____

[1] This brief refers to the parties as Plaintiffs and LACCD or Defendant.

emotional distress damages—an argument that LACCD had long forfeited by failing to raise it during the first six years of this litigation. Second, it applied limitations on the damages available under Spending Clause legislation to Title II of the ADA, which was enacted pursuant to the Fourteenth Amendment and the Commerce Clause. Third, by concluding that the jury could not have based its award on Plaintiffs' lost educational opportunities, the district court improperly second-guessed the jury's judgment and assumed the jury simply disregarded the court's instructions. Although the first two errors are grounds for a retrial, Plaintiffs ask only that the jury's damages award be reinstated.

The district court also undermined the jury's factfinding role by failing to issue injunctive relief addressing the many ADA violations the jury found. The district court's injunction leaves unremedied critical issues that are foundational to the student experience at LACCD. For example, it does not require LACCD to timely provide accessible course materials and testing accommodations to blind students. The injunction also ignores the substantial evidence at trial and in other record submissions that many of LACCD's ADA violations were caused by deeper, systemic, and ongoing issues like an ineffective procurement process for new technology and a lack of accessibility-related training on ADA compliance. In refusing to order certain relief, the district court improperly credited LACCD's eleventh-hour, litigation-driven changes—despite undisputed expert testimony that

these changes were insufficient to ensure accessibility for blind students. By inaccurately recasting LACCD's violations as one-offs, the district court's injunction minimizes the jury's findings of systemic, repeated, and intentional ADA violations. This Court should overturn the district court's injunction and remand this case with instructions to issue an injunction that fully addresses the scope and type of injuries Plaintiffs proved at trial.

## JURISDICTIONAL STATEMENT

Because Plaintiffs' claims arise under Title II of the ADA, the district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the final judgment of the district court entered on February 29, 2024, including the district court's Order Regarding Final Injunction and Order Granting Defendant's Motion for a Remittitur to Conform the Damages Award to the Evidence, as well as the Court's "Pre-Trial Rulings" Order entered on May 23, 2023. 1-ER-1–19. Plaintiffs filed a timely notice of appeal within 30 days of the judgment on March 13, 2024. 10-ER-1810; *see* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1. Did the district court err in sharply reducing Mr. Payan's damages and eliminating Ms. Mason's by: (a) entertaining LACCD's forfeited request to disallow emotional distress damages, prejudicially raised for the first time, following six years of litigation, just eight days before the retrial; (b) applying case law restricting damages under a different statute for inapplicable reasons; and/or (c) assuming the jury's damages award was intended nearly entirely to compensate for emotional distress and ignoring that the jury followed the court's instructions?

2. Did the district court improperly limit the scope of the injunction in contravention of the jury's robust findings of repeated and, in many cases, intentional, ADA violations and based on an erroneous understanding of the specific factual findings the jury needed to make to support important elements of injunctive relief?

All pertinent statutes and regulations appear in the Addendum to this brief.

## STATEMENT OF THE CASE

### I.    Procedural History

Plaintiffs are two blind individuals and two organizations that promote the welfare of the blind and their full and equal integration into society. On March 2, 2017, Plaintiffs sued LACCD under Title II of the ADA and Section 504 of the Rehabilitation Act to redress LACCD's failure to provide blind students an equal educational opportunity. 3-ER-533–64. After discovery, Plaintiffs filed three partial summary judgment motions (two at the district court's direction). The district court denied the first two motions in their entirety and granted in part and denied in part the third. 3-ER-435–91. In May 2019, the court held a bench trial on liability. 3-ER-433–35, 10-ER-1862. On May 21, 2019, the court issued findings

of fact and conclusions of law. 3-ER-412–32. The court held a jury trial on damages in June 2019. 3-ER-375–87, 10-ER-1857. At that trial, the district court instructed the jury that it "should consider the mental or emotional pain and suffering experienced by the plaintiff" in determining the measure of damages. 2-ER-259:18–20. Plaintiffs' closing argument, in discussing damages, also referred to the "pain and emotional upset" Plaintiffs had suffered because of LACCD's legal violations. 2-ER-270:23–271:1. The jury ultimately awarded Mr. Payan $40,000 in damages. 3-ER-374. In July 2019, the district court entered a permanent injunction and final judgment 3-ER-368–71.

All parties appealed from the 2019 final judgment. LACCD did not challenge the jury's consideration of Plaintiffs' emotional distress in awarding damages or the district court's instruction permitting the jury to do so. 3-ER-276–367. On August 24, 2021, this Court vacated the district court's judgment in part and remanded the case for a new trial on Plaintiffs' claims. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 740 (9th Cir. 2021); *Payan v. Los Angeles Cmty. Coll. Dist.*, Nos. 19-56111, 19-56146, 2021 WL 3743307, at *3 (9th Cir. Aug. 24, 2021). Among other holdings, this Court concluded that Plaintiffs should have been permitted to try all elements of their claims to a jury. *Payan*, 2021 WL 3743307, at *3.

On remand, Plaintiffs filed a Second Amended Complaint, to remove their claim arising under Section 504. 2-ER-215–46. The district court held several hearings and status conferences in June, August, September, and October 2022 and in January 2023. *See* 9-ER-1580–1808. Eventually, the court set a jury trial for May 23, 2023, with a pretrial conference eight days beforehand, on May 15.

At the pretrial conference, LACCD, for the first time, asked the district court to limit the damages Plaintiffs could seek in light of *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022). 9-ER-1567:9–1571:10. That same day, the court ordered LACCD to file a summary judgment motion by May 17 on the issue of damages and ordered Plaintiffs to respond by May 19. 2-ER-163–66. At a second pretrial conference held on May 22, 2023,[2] the district court announced orally that it would limit the damages Plaintiffs could seek at trial to "actual damages with respect to out of pocket expenses by Payan and Mason," and held that "[t]here are no emotional distress damages under Title II of the ADA, and there is no admissible evidence with regard to damages in the form of lost employment opportunities." 9-ER-1523:13–1524:1. The next day, trial began and

---

[2] Also at the May 22 pretrial conference, the district court, after confirming its previous ruling that the NFB and NFB of California have standing in this case, which was affirmed by this Court, prohibited these organizations' representatives from testifying at the trial. *See* 9-ER-1533:2–1534:18, 1543:7–1544:15; *Payan*, 2021 WL 3743307, at *1–2. The NFB is the oldest and largest national organization of blind persons, with affiliates in all 50 states, including the NFB of California, the California affiliate. 2-ER-221–24 ¶¶16-18.

the district court issued its written pretrial rulings, holding, among other issues, that "Plaintiffs may not pursue emotional distress damages or damages for alleged lost employment opportunities." 2-ER-144.

On May 26, 2023, at the conclusion of the four-day trial, the jury returned its verdict. It found that LACCD had violated the ADA in fourteen distinct ways— nine of them intentionally—and awarded damages of $218,500 to Mr. Payan and $24,000 to Ms. Mason. 2-ER-134. In June 2023, the court held a status conference to determine how the injunctive relief phase would proceed, followed by two evidentiary hearings in July and August 2023. 4-ER-566–737, 10-ER-1825–26.

In July 2023, LACCD filed a Motion for a Remittitur to Conform the Damages Award to the Evidence, or in the Alternative, for a New Trial. 2-ER-25. The district court granted LACCD's Motion on February 29, 2024, reducing the damages awarded to Mr. Payan to $1,650 and to $0 for Ms. Mason. 1-ER-12–16. Also on February 29, 2024, the district court issued a permanent injunction and final judgment, 1-ER-9, along with an Order Regarding Final Injunction, 1-ER-2. The district court's injunction addressed the jury's findings that LACCD had violated the ADA in maintaining an inaccessible library, websites, and Academic Accommodations Authorization forms. 1-ER-10. Although the injunction also required LACCD to periodically independently verify third-party vendors' representations about the accessibility of educational technology, it did not specify

7

what should happen if educational technology was found to be inaccessible. 1-ER-11. The injunction contained no other requirements responding to the jury's other findings of LACCD's numerous ADA violations—including violations the jury found to be intentional.

## II.  Facts

Roy Payan and Portia Mason are two blind individuals who enrolled as students at Los Angeles City College ("LACC"), part of LACCD, in 2015. 2-ER-174. Mr. Payan and Ms. Mason both registered as students with disabilities with the Office of Special Services ("OSS") and were approved for accommodations such as accessible document formats for course materials, specialized testing procedures, and permission to record their classes and use notetakers. 2-ER-174–75, 8-ER-1514–17.

Despite LACCD's knowledge of the need to accommodate Mr. Payan and Ms. Mason, it failed to provide timely accessible materials, to ensure the accessibility of critical resources such as the library, websites, and educational software programs, and to successfully execute agreed-upon accommodations. These failures left Mr. Payan and Ms. Mason shut out of much of their educational experience. During the May 2023 trial, the jury heard testimony from Mr. Payan about how he could not follow along in his Math 124A course because he received accessible versions of his textbook chapters in piecemeal fashion and only after

8

they were discussed in class. 5-ER-781:23–784:14. He testified that receiving the textbook chapters late meant that he was "consistently behind." 5-ER-784:9-14.

LACC's use of the inaccessible MyMathLab software in Mr. Payan's math classes left him further behind. Mr. Payan testified that he could not use MyMathLab, as sighted students could, to take practice quizzes, watch tutorial videos, and participate in chat room discussions where students' questions were answered by the professor in real time. 5-ER-784:24–785:24, 787:15–788:1. While other students could complete homework assigned through MyMathLab from any location and at any time they chose, Mr. Payan had to sit with a tutor at OSS to complete his MyMathLab assignments—reducing the amount of time available to him for substantive tutoring. 5-ER-788:2–790:8. Although sighted students could complete homework on weekends or evenings, Mr. Payan did not have that option because OSS was only open on weekdays from 9:00 am until 2:00 or 3:00 pm. 5-ER-788:20–789:11. Mr. Payan testified that he was limited to two one-hour tutoring sessions at OSS a week, which meant that he frequently could not complete all of his MyMathLab homework for the week. 5-ER-789:20–790:8.

Similarly, for Mr. Payan's Fall 2016 psychology course, LACCD used an inaccessible online learning platform, Etudes, forcing Mr. Payan to miss out on educational opportunities offered to his sighted classmates. Because of Etudes' accessibility barriers, Mr. Payan was shut out of the chatroom feature used by his

9

classmates to discuss concepts and theories from the course and respond to the professor's questions and to other students' answers in real time. 6-ER-957:22–959:15. Mr. Payan testified about how he missed out entirely on this exchange of ideas that would sometimes be brought up in class by other students, but which Mr. Payan could not follow. 6-ER-959:16–25.

LACCD also failed to provide Mr. Payan timely, accessible versions of handouts used during classes, leaving him excluded from classroom discussions about those handouts. 5-ER-779:18–25, 825:5–20. Mr. Payan testified that LACCD never provided him accessible versions of PowerPoint presentations used in his classes, which left him no way to follow along with what the instructor presented visually on the screen during class. 6-ER-960:10–961:16. Mr. Payan's experience of receiving untimely course materials and being unable to access Etudes and MyMathLab—even after notifying LACC staff about the issues—were echoed by former LACC student Sylvia Mitchell, who is also blind and who testified about her experiences attending LACC between 2011 and 2016. 6-ER-1109:4–9, 1110:7–1111:21, 1112:8–22, 1115:25–1121:5.

The jury heard evidence that in providing untimely accessible course materials and in failing to consider accessibility before procuring educational software (like MyMathLab and Etudes), LACCD had violated its own policies.

The jury reviewed excerpts[3] from the Guidelines for Producing Instructional and Other Printed Materials in Alternate Media for Persons with Disabilities issued in *April 2000* by the Chancellor's Office of the California Community Colleges—more than a decade before Mr. Payan and Ms. Mason enrolled at LACC. 8-ER-1512; 8-ER-1399:3–25, 1421:3–25, 1433:7–18. These Guidelines advised community colleges that "timely" provision of accessible course material means "by the time other students in the class will be called upon to use" the material. 8-ER-1513. The Guidelines "strongly recommend[ed]" that "before purchasing new instructional media or software, colleges should confirm that the product is compatible with commonly available access equipment and software." 8-ER-1513.

The jury also considered LACC's Alternate Media Production Policy, developed in accordance with the April 2000 Guidelines, which required "[a]ll instructional resources or materials purchased or leased" from third parties to be accessible and tasked the "Dean of Educational Technology"—a position that was never filled at LACC—with reviewing all procurement decisions to ensure compliance. 8-ER-1512; 6-ER-954:16–20; 8-ER-1507, 3-ER-523:24–524:6,

---

[3] Although the district court only permitted the jury to view excerpts of these Guidelines, the court had access to the full Guidelines, which were part of the record below. 3-ER-502.

525:9–16 (deposition designation[4] at trial). Similarly, the jury considered LACCD's Administrative Regulation B-34, issued in June 2015, which required LACCD to include accessibility in the criteria for selecting new software purchases no later than by December 2015. 8-ER-1496, 1506. Neither LACC's ADA coordinator nor LACCD's ADA coordinator knew if anyone had assessed new educational software for accessibility—or if anyone was in charge of making sure this occurred. 3-ER-525:9–16, 526:20–22, 527:17–525:8, 529:5-8; 5-ER-906:6–18, 911:24–912:2.

The jury found that LACCD had violated the ADA—and did so intentionally—by using the inaccessible MyMathLab and Etudes programs in Mr. Payan's math and psychology courses respectively. 2-ER-135–136, Qs. 3–4. The jury also found LACCD had violated the ADA by failing to provide Mr. Payan accessible textbooks, handouts, and PowerPoint presentations in Mr. Payan's courses. 2-ER-136–137, Qs. 5 & 8.

Both Mr. Payan and Ms. Mason testified about their experiences being unable to perform research independently in the LACC library because the library databases were inaccessible and the library computers lacked functioning screen

---

[4] Because the text of video deposition designations that were played at trial does not appear in the trial transcripts, (*see, e.g.*, 5-ER-924:11-22), Plaintiffs refer directly to the deposition transcripts. Plaintiffs' pre-trial filing of deposition designations shows which portions of the deposition transcripts were played into the record at trial. *See* 2-ER-209–210.

access software. 6-ER-962:12–966:10, 967:14–975:8. Ms. Mitchell also testified

about access barriers she encountered trying to use LACC's library—which she

reported to LACC staff—years before Mr. Payan and Ms. Mason attended the

school. 6-ER-1122:11–1124:19. The jury ultimately found that LACCD had

intentionally violated the ADA in failing to make its library accessible. 2-ER-135,

Q. 2.

       Mr. Payan testified about how both the LACC and LACCD websites were

inaccessible to him, requiring him to obtain third-party assistance to register for

courses, apply for financial aid, learn about events on campus, and perform other

tasks that sighted students could perform independently. 5-ER-827:5–9, 834:25–

838:5. Peter Bossley, an expert in digital accessibility and accessibility in higher

education, testified that he had tested the LACCD website and found it to be

inaccessible to blind users. 6-ER-982:5–990:25, 1005:2–1006:9. Similarly, Jon

Gunderson, Ph.D., also an expert in the fields of digital accessibility and

accessibility in higher education, testified that the LACC website was also

inaccessible for blind users. 6-ER-1071:23–1083:24, 1084:10–1085:19. LACCD

did not offer any expert witnesses at trial. *See generally* 5-ER-739, 6-ER-933, 7-

ER-1153, 8-ER-1346.

       The jury also considered LACCD's Administrative Regulation B-33, issued

in February 2014, entitled "Web Accessibility Standards and Guidelines," which

established "requirements for website accessibility . . . to ensure compliance with state and federal laws regarding equal access to websites and content for individuals with disabilities." 8-ER-1481; 5-ER-924:14–22. Nevertheless, LACCD's ADA coordinator was unaware if anyone had ever evaluated websites used at its colleges for accessibility. 5-ER-911:20–23. Similarly, LACCD's Chief Information Officer for Information Technology testified that he was unaware if LACCD's web-based course registration system had ever been tested for accessibility. 5-ER-915:14-22, 920:13–923:16. The jury concluded that LACCD had intentionally violated the ADA in failing to make its websites accessible. 2-ER-135, Q. 1.

Both Mr. Payan and Ms. Mason testified about their experiences receiving print accommodation letters from OSS that they could not access, which prevented them from learning about all their options for potential accommodations and knowing what accommodations OSS had approved. 5-ER-767:9–769:16, 770:17–771:11, 810:9–812:9, 853:8-13, 873:1–875:6. Ms. Mitchell recounted experiencing the same problem years before. 6-ER-1110:24–1111:4. The jury concluded that LACCD had intentionally violated the ADA in failing to provide accommodation letters in accessible formats to both Mr. Payan and Ms. Mason. 2-ER-138-139, Qs. 11–12.

The jury also heard testimony from Mr. Payan and Ms. Mason about how LACCD failed to honor their approved accommodations. They testified about waiting hours—even days—for exams to be administered in an accessible manner and LACCD providing unqualified readers who failed to properly read them their exams. 5-ER-802:21–806:20, 817:20–819:1, 834:4-24, 871:1–872:25. The jury found that LACCD intentionally violated the ADA in failing to provide proper testing accommodations to both Mr. Payan and Ms. Mason. 2-ER-139-140, Qs. 15–16.

Mr. Payan testified about LACCD failing to provide his approved accommodations. For example, instructors refused to allow him to record classes, even though it was an approved accommodation. Similarly, even though he was approved for a notetaker, LACCD never provided him with one. 5-ER-768:25–769:12, 770:17–771:11, 773:22–775:7, 812:11–815:1, 820:4–821:15, 827:22–829:1. The jury found that LACCD had violated the ADA in failing to allow him to record certain classes and by failing to provide him a notetaker. 2-ER-139, Qs. 13–14.

Finally, the jury heard testimony from Mr. Payan about being steered away from certain courses because of his blindness. 5-ER-771:18–777:6, 827:22–832:25. It ultimately found that LACCD intentionally violated the ADA in refusing Mr.

Payan entry to a Math 125 course and that it also violated the ADA in trying to steer him away from a section of Statistics 227. 2-ER-140–41, Qs. 17 & 19.

In total, the jury found that LACCD had violated the ADA in fourteen different ways, nine of which were done intentionally. 2-ER-134. The jury awarded Mr. Payan $218,500 and Ms. Mason $24,000 in damages. 2-ER-141.

## SUMMARY OF ARGUMENT

The district court erred in drastically reducing the jury's damages award. First, by waiting more than six years after this case was filed, following two trials and an appeal, to first argue—just eight days before the retrial was set to begin—that Plaintiffs were not entitled to emotional distress damages, LACCD forfeited this argument. This Court did not remand this case for a retrial so that LACCD could concoct new ways to limit Plaintiffs' damages. The district court's decision to entertain, and ultimately grant, LACCD's eleventh-hour request to limit damages was severely prejudicial to Plaintiffs. Second, the district court applied limitations on damages that apply only to Spending Clause legislation to Title II of the ADA, which Congress enacted under the Fourteenth Amendment and the Commerce Clause. Although Title II of the ADA incorporates the remedies under Section 504 of the Rehabilitation Act, Congress drafted the ADA in this manner without knowledge that the Supreme Court would one day declare emotional distress damages unavailable under Section 504. The district court erred in

16

imposing this constitutional limit on damages to non-Spending Clause legislation. Third, the jury's award appropriately compensated Plaintiffs for their nonpecuniary loss of educational opportunity, was supported by ample evidence in the record, and was consistent with the district court's instructions. Accordingly, the district court incorrectly usurped the role of the jury in second guessing the amount of damages it awarded. This Court should reinstate the jury's damages award on any of these three independent bases.

The district court also erred in granting limited injunctive relief that fails to address most of the ADA violations the jury found. Given the jury's findings of LACCD's numerous, often intentional, ADA violations, the district court's injunction is too narrow to ensure that LACCD does not continue violating the law. For example, although the jury found that LACCD failed to provide timely, accessible course materials and LACCD produced no evidence that it has implemented plans to correct this problem, the injunction is silent on this issue. The district court also refused to remedy problems with LACCD's procurement process and staff training on ADA compliance that were implicit in the jury's findings. The injunction improperly gives LACCD the benefit of the doubt with respect to its recent litigation-driven changes, despite LACCD's history of noncompliance and the undisputed expert evidence that these recent changes are inadequate to ensure accessibility for blind students. The district court also

incorrectly categorized a number of LACCD's violations as single incidents, and refused to address them in the injunction, despite the evidence that they were not isolated in nature and that LACCD had failed to take any corrective measures to prevent their recurrence in the future. Finally, in refusing to order training, expert assistance, and accountability measures, the district court ignored the substantial evidence—and jury findings—of LACCD's systemic, repeated, and intentional ADA violations. This Court should reverse the district court's injunction and remand this case with instructions for the district court to issue an injunction that better fits the jury's findings of numerous and systemic ADA violations.

## ARGUMENT

### I. Standards of review.

This Court reviews summary judgment decisions *de novo*. *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002). While the Court reviews orders on motions for new trial and remittitur for abuse of discretion, factual findings underlying the district court's decision should be reversed if they are "illogical, implausible or without support in inferences that may be drawn from the record." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1063 (9th Cir. 2022) (internal quotation marks omitted).

Regarding the injunction, this Court reviews legal conclusions *de novo*, factual findings for clear error, and the decision to grant an injunction, as well as

the scope, for abuse of discretion. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013).

## II.  The district court erred in reducing Plaintiffs' damages award.

### A.  LACCD forfeited its argument against emotional distress damages.

LACCD never argued that Plaintiffs could not obtain emotional distress damages until May 2023. By that time, the parties had briefed multiple motions for summary judgment between 2017 and 2019, participated in both a bench trial and a jury trial in 2019, filed motions in limine in advance of both, and cross-appealed to this Court. It was not until just eight days before this case was re-tried in 2023 that LACCD first asked the district court (indeed, any court) to deny Plaintiffs emotional distress damages. By waiting six years to raise this argument, LACCD forfeited it.

Although *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230, (2022), definitively established that "emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes," this argument has been available to LACCD since at least 2002, when the Supreme Court decided *Barnes v. Gorman*, 536 U.S. 181 (2002). In *Barnes*, the Court held that punitive damages were unavailable for Section 504 claims because, unless recipients of federal funding are on notice of additional remedies, the remedies

19

under Spending Clause legislation are limited to the "forms of relief traditionally available in suits for breach of contract." *Id.* at 187.

In *Asfall v. Los Angeles Unified School District*, this Court rejected the very argument that LACCD raised with the district court—that *Cummings* was an intervening change in the law excusing its earlier failure to argue that emotional distress damages were unavailable. No. 20-55599, 2022 WL 2764747, at *4 (9th Cir. July 15, 2022) (declining to address the defendant's argument that *Cummings* applies to Title IX and noting that the defendant school district "'has not shown the law changed in such a manner that [it] could not have made [the new argument] earlier'" (alterations in original) (quoting *Robinson v. Kramer*, 588 F.3d 1212, 1217 (9th Cir. 2009)). *Barnes* "signaled the viability of arguments against noneconomic damages under Spending Clause legislation." *Asfall*, 2022 WL 2765747, at *4. Therefore, the school district "should have known that the argument against noneconomic damages under Title IX was viable" and "[b]y not raising the argument sooner even though it could have, [the defendant] forfeited it." *Id.*; *accord S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 719 (6th Cir. 2023) (holding that defendant had forfeited argument that emotional distress damages were unavailable under Title IX by not raising it before appeal "because the legality of Title IX emotional distress damages remained an open question during the pendency of this case"). The same reasoning applies here.

LACCD missed the opportunity to brief the unavailability of emotional distress damages when it failed to file a motion to dismiss, motion for summary judgment, motion in limine, or any other motion on this issue at any time before May 2023. Nor did LACCD challenge the jury's 2019 award of damages to Mr. Payan on this basis during the prior appeal to this Court. Once this case was remanded after *Cummings* was decided in April 2022, LACCD still waited more than a year to argue that emotional distress damages were unavailable. LACCD's decision to sit on this argument amounts to forfeiture.

Remanding this case for a new trial did not reset the clock on LACCD's forfeiture. This Court explained that it was remanding this case for a new trial so that *Plaintiffs* could pursue their claims under more than a disparate impact theory of discrimination, *Payan*, 11 F.4th at 739–740, and have a jury determine liability, *Payan*, 2021 WL 3743307, at *3. Nowhere in this Court's decisions did it suggest LACCD should have a second chance on remand to assert that emotional distress damages are unavailable. *Cf. Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (holding, on remand from Supreme Court, that party had forfeited argument by failing to raise it during the first appeal). Because this argument was available to LACCD from the moment Plaintiffs filed this case, LACCD has no excuse for waiting six years to assert it.

Permitting LACCD to raise its forfeited emotional distress damages argument six years into this litigation, on the eve of the retrial, severely prejudiced Plaintiffs. Had Plaintiffs known earlier in the litigation that they may not be able to pursue emotional distress damages (or, at least, that LACCD would challenge them), they likely would have built their case for damages differently. During discovery, they could have more fully developed their case for economic and educational damages related to delayed degrees and careers, the loss of educational benefit from inaccessible classes, and the damage to grades from lack of accommodations. Such damages would have been available, even if *Cummings* applied. *See supra* Section II.C.i.

Furthermore, after six years of litigation, memories fade. For example, at the 2023 retrial, Ms. Mason testified that she could not recall how much she had paid for a handbook she was required to purchase for a 2016 course, but that she ultimately could not effectively use. 5-ER-880:22–881:1, 857:19–858:2, 860:13–19, 864:5–9. Had LACCD argued that emotional distress damages were unavailable before the 2019 trials in this case, Plaintiffs' memories of what they had paid for inaccessible course materials just a few years earlier likely would have been fresher, or Plaintiffs could have gathered evidence to admit at trial or use to refresh Plaintiffs' recollections.

The timing of LACCD's assertion of its damages argument was also prejudicial given that Plaintiffs had just two days to respond to LACCD's motion—and these two days were during the week before trial. 2-ER-163. (granting LACCD until May 17 to file its summary judgment motion regarding damages and Plaintiffs until May 19 to respond). Compounding this tight timeline was the district court's decision, first announced at the May 15, 2023 pretrial conference, to raise *sua sponte* a number of issues for potential summary judgment and to require Plaintiffs to file a responsive summary judgment brief also by May 19, 2023. 2-ER-163–66. Thus the two days Plaintiffs had to respond to LACCD's motion regarding damages were spent not only preparing for trial, but also briefing newly raised summary judgment issues. Had LACCD timely raised its damages argument, there would have been no exigency requiring Plaintiffs to focus on briefing a forfeited argument when they should have been preparing for trial in less than a week. Accordingly, the district court should never have entertained LACCD's forfeited argument regarding the availability of emotional distress damages.

### B. Emotional distress damages are available under the ADA.

In addition to improperly reaching the availability of emotional distress damages, the district court—without explanation—erroneously applied *Cummings*' restrictions to the ADA, which is not Spending Clause legislation. *Cummings* only

applies to Section 504 and other Spending Clause legislation. There is no binding authority applying the Supreme Court's holding in *Cummings* to claims under Title II.

The Supreme Court's reasoning in *Cummings* turned on the fact that Congress passed Section 504 pursuant to its Spending Clause authority. *See* 596 U.S. at 216. Finding the relationship between funding recipient and funder to be in the nature of a contract, the Court applied its reasoning in *Barnes* and held that emotional distress damages are not recoverable under Section 504 because federal funding recipients have not "consented to be subject to damages for emotional distress." 596 U.S. at 222. The ADA, by contrast, is not Spending Clause legislation; it was enacted pursuant to the Fourteenth Amendment and the Commerce Clause and no semi-contractual relationship exists between the federal government and covered entities. 42 U.S.C. § 12101(b)(4); *Tennessee v. Lane*, 541 U.S. 509 (2004). Thus, the restrictions of contract law do not apply to Title II.

Nevertheless, the district court extended *Cummings* to bar emotional distress damages under Title II and did so without explaining its reasoning. Presumably, the district court held that *Cummings* applied because when Congress passed Title II of the ADA in 1990, it declared that the remedies in Title II were the same as those available under Section 504. 42 U.S.C. § 12133. Courts outside of the Ninth Circuit have imported *Cummings*' Spending Clause restrictions onto Title II based

24

on this reasoning as well. *See A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*, 110 F.4th 1309, 1314 (11th Cir. 2024); *Doherty v. Bice*, 101 F.4th 169, 174–75 (2d Cir. 2024). But these courts' singular focus on the text of Title II—devoid of any context—fails to comport with the Supreme Court's framework for considering these types of questions.

In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), the Court considered whether damages were available under Title IX—Spending Clause legislation that is silent on the types of remedies available. *Id.* at 63. The Court began by noting that it "presume[s] the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Id.* at 66. The next question then is "whether Congress intended to limit application of this general principle in the enforcement of Title IX." *Id.* at 71. This determination is not simply "a matter of statutory construction." *Id.* (internal quotation marks omitted). Rather, "in determining Congress' intent to limit application of the traditional presumption in favor of all appropriate relief, we evaluate the state of the law when the Legislature passed Title IX." *Id.*; *see also Brown v. GSA*, 425 U.S. 820, 828 (1976) (in determining legislative intent, "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was").

This "contextual approach" can give way to a "more traditional" method of statutory interpretation for any amendments to the legislation enacted after a pertinent judicial decision is announced—when Congress is "legislating with full cognizance of that decision." *Franklin*, 503 U.S. at 72; *see Lorillard, Div. of Loew's Theatres, Inc. v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change.").

In the present case, the contextual approach reveals that Congress never intended to limit the remedies available under Title II by incorporating the then-unlimited remedies of Section 504. To start, the ADA is widely applicable "remedial legislation," that "should be construed broadly to effectuate its purposes." *See Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172 (9th Cir. 2002) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). The regulations issued by the Department of Justice interpreting Title II state that the "full range of remedies (including compensatory damages)" are available under Title II. 28 C.F.R. Pt. 35, App. A (analysis of 28 C.F.R. § 35.172(c)(2)). Similarly, the House Report explained that the "full panoply of remedies" should be available for violations of Title II. H.R. Rep. No. 101-485 (III), at 52 (1990).

When Congress linked the Title II remedies to those under Section 504 in 1990, *Barnes* and *Cummings* had yet to be decided. Congress was not on notice

26

that the Supreme Court would limit Section 504 remedies to exclude emotional distress damages. *See, e.g.*, *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1107 (9th Cir. 1987) (noting that the "plaintiffs suing under section 504 may pursue the full panoply of remedies, including . . . monetary damages"). In other words, Congress was not "legislating with full cognizance of" the *Barnes* or *Cummings* decisions. *Franklin*, 503 U.S. at 72.

Nor would Congress have intentionally subjected the ADA—a law it enacted under its Fourteenth Amendment and Commerce Clause powers—to the narrower remedies permitted under its Spending Clause powers. *See King v. Burwell*, 576 U.S. 473, 494 (2015) (rejecting an interpretation of a statute where "[i]t is implausible that Congress meant the Act to operate in this manner"). There is no need to do a deep dive into the congressional record to find support for this proposition; Congress said as much in the very text of the ADA. Congress explicitly stated that its intentions were "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and "to invoke *the sweep* of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. §§ 12101(b)(1) & (4) (emphasis added). Absent from this

27

purpose is any intention to limit the remedies available pursuant to the Spending Clause.

The Supreme Court's holdings in *Barnes* and *Cummings* do not change this analysis. In *Barnes*, the majority stated in a footnote that its holding that punitive damages are unavailable under Section 504 applies with equal force to Title II because the latter incorporates the former's remedies. *Barnes*, 536 U.S. at 189 n.3. The Second and Eleventh Circuits relied on this footnote to support their application of *Cummings* to Title II. *See A.W.*, 110 F.4th at 1314; *Doherty*, 101 F.4th at 175. But the Second and Eleventh Circuits failed to recognize that because punitive damages are separate and distinct from emotional distress damages, *Barnes* is distinguishable.

In *Barnes*, the Court recognized "the traditional presumption against imposition of punitive damages on government entities"—although it did not decide the case on that basis because that argument had not been raised below. *Barnes*, 536 U.S. at 190. Three justices in concurrence would have reached the same conclusion that punitive damages are unavailable under Section 504 and Title II by applying this traditional presumption, as articulated in *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)—a presumption that does not hinge on whether a claim is brought under Spending Clause legislation. *Barnes*, 536 U.S. at 193 (Stevens, J., concurring) ("[T]he petitioners—in addition to most defendants

28

sued for violations of Title II of the ADA and § 504 of the Rehabilitation Act of 1973—are clearly not subject to punitive damages pursuant to our holding in *Newport*.").

Because it was well understood before the ADA was enacted in 1990 that, per *Newport*, punitive damages were not an available remedy against municipalities, taking the contextual approach prescribed in *Franklin* would have made no difference. Congress was aware that punitive damages were generally unavailable against Title II entities when it passed the ADA. As discussed above, however, this was not so with respect to emotional distress damages. Thus, *Barnes'* footnote should not be mechanically applied in the present case without first engaging in the contextual inquiry the Supreme Court outlined in *Franklin*.

A recent case before the Supreme Court illustrates that the applicability of *Cummings* to the ADA is not as automatic as the Second and Eleventh Circuits believed it to be. In *Luna Perez v. Sturgis Public Schools*, the school district argued in its brief that *Cummings* limited emotional distress damages under the ADA. Br. for the Resp'ts. at 9, 14, 29, *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142 (2023) (No. 21-887). Yet the Court explicitly declined to address the issue. *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 151 (2023). At oral argument, when counsel for the school district argued that "in light of the state of the law right now, . . . it's not clear that there even are compensatory damages available under the ADA," Justice

29

Kagan responded that "no one's decided that question yet." Tr. of Oral Arg. at 80:8–11, 17–18, *Luna Perez v. Sturgis.*, No. 21-887 (U.S. Jan. 18, 2023), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-887_b81g.pdf. This statement, and the Court's decision to leave the school district's argument unaddressed, belie the overly simplistic notion that *Barnes* requires an automatic extension of *Cummings* to the ADA. Accordingly, this Court should follow the Supreme Court's instructions in *Franklin* and decline to restrict the remedies available under Title II in a manner Congress never intended.

### C. The jury's damages award was based on ample evidence of lost educational opportunities and was consistent with the court's instructions.

Courts must give a jury's finding of the appropriate damages award "substantial deference," *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996) (citing *Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986)), *aff'd*, 526 U.S. 687 (1999); *see Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, No. 13-CV-02862-JST, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd*, 743 F. App'x 843 (9th Cir. 2018) ("Courts should be cognizant that 'in cases involving intangible, non-economic losses' determining damages 'is a matter peculiarly within a jury's ken.'" (quoting *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999))). Accordingly, courts may only reduce a jury's damages award if it is

"grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes*, 95 F.3d at 1435. That was not the case here and the district court erred in concluding otherwise.

### 1. Lost educational opportunities are compensable under Title II.

Even if there were a basis to prohibit emotional distress damages, Plaintiffs are still entitled to the damages the jury awarded them. Courts have declined to extend *Cummings*' limitation on emotional distress damages to other forms of compensatory relief. *See A.W.*, 110 F.4th 1314–15; *Doe v. Univ. of Mississippi*, No. 3:18-CV-138-DPJ-ASH, 2024 WL 3011133, at *5 (S.D. Miss. June 14, 2024); *McGowan v. S. Methodist Univ.*, 715 F. Supp. 3d 937, 956–57 (N.D. Tex. Feb. 5, 2024); *Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-00614-MSN-ID, 2023 WL 424265, at *4 (E.D. Va. Jan. 25, 2023); *Wade v. Univ. Med. Ctr. of S. Nevada*, No. 2:18-CV-1927-RFB-EJY, 2023 WL 9598746, at *3 (D. Nev. Feb. 13, 2023); *Chaitram v. Penn Medicine-Princeton Med. Ctr.*, No. 21-17583, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022); *Montgomery v. D.C.*, No. 18-1928, 2022 WL 1618741, at *27 (D.D.C. May 23, 2022). The general rule is that "[w]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Franklin*, 503 U.S. at 66 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

31

In particular, *Cummings* does not affect Plaintiffs' right to seek damages for lost opportunities resulting from Defendant's discrimination—including loss of educational opportunity. *See A.W.*, 110 F.4th 1314–15 (agreeing with the plaintiff students that they could seek "compensation for lost educational benefit" under Title II); *Univ. of Mississippi*, 2024 WL 3011133, at *5 (holding, under Title IX, that "contract damages were foreseeable based on lost educational opportunities" given the statute's focus on educational benefit); *McGowan*, 715 F. Supp. 3d at 956–57 (declining to "find that compensatory damages for loss of educational opportunities and benefits are precluded as a matter of law"); *Fairfax Cnty. Sch. Bd.*, 2023 WL 424265, at *5 ("[L]osses of educational opportunities remain recoverable post-*Cummings*."). Similarly, in *Montgomery v. D.C.*, the court recognized that the alleged failure to accommodate a detainee during a police interrogation could have "depriv[ed] him of the opportunity to meaningfully access and fully participate in his interrogations," and this "loss of opportunity" was "the type of injury that would normally be recoverable in a breach of contract case." 2022 WL 1618741, at *26. Even with emotional distress damages restricted, these other forms of damages remain available.

### 2. Plaintiffs presented evidence of lost educational opportunities.

Although the district court seemed to recognize the availability of damages for Plaintiffs' loss of educational opportunity, it held that the jury's damages award

32

could not have been for lost educational opportunities because "Plaintiffs neither argued nor produced evidence in the trial with which the jury could determine the value of the 'lost educational opportunities." 1-ER-14. In making this statement, the district court overlooked the ample evidence Plaintiffs produced during the trial of their lost educational opportunities. Mr. Payan and Ms. Mason testified about the various ways LACCD denied them educational opportunities and prevented them from fully and meaningfully participating in all that LACCD had to offer. For example:

- Mr. Payan testified that when LACCD failed to provide him timely, accessible versions of class handouts, he was left to sit through class "more as a spectator than as a student because I couldn't participate." 5-ER-825:5–20. He further testified that he was deprived of "the opportunity to participate at the same level of participation as the rest of the students," even though "there was a lot of information that [he] would [have] liked to participate in, and [he] thought that [he] could have contributed something." 5-ER-779:18–25.

- Mr. Payan testified that receiving accessible textbook chapters late, after they were discussed in class, left him with "no way . . . to participate" and caused him to fail his statistics class, since he "was

always behind," unable to catch up with his sighted peers, or "even study with them because they were already studying something else, and [he] was still studying something . . . a couple days older or a week older." 5-ER-822:6–823:10.

- Mr. Payan testified how LACCD's failure to provide him accessible versions of PowerPoint presentations used in his history class rendered him unable "to participate at the same level that everybody else was participating [at]," which he particularly lamented given his keen interest in history. 6-ER-960:10–961:16.

- Mr. Payan and Ms. Mason testified that they were unable to use LACC library's databases because of various access barriers, again denying both of them the educational opportunities afforded their sighted peers. 6-ER-962:12–966:10, 967:14–975:8.

- Mr. Payan and Ms. Mason testified that LACCD failed to provide them with their approved testing accommodations, including proctors qualified to administer tests in particular subjects. They testified that the failure to timely administer certain tests deprived them of the same educational opportunity offered to their sighted peers. 5-ER-802:21–806:20, 816:20–818:1, 834:4–24, 871:1–872:25. Mr. Payan testified that without proper exam

accommodations, he could not "fully comprehend the questions that were being asked of" him. 5-ER-806:10-20.

- Both Mr. Payan and Ms. Mason testified that LACCD failed to provide them their accommodation letters in accessible formats, leaving them unable to review the full menu of options and ensure they were obtaining all available accommodations they required, further contributing to the loss of their educational opportunities—particularly where they did not receive accommodations that allowed them to more fully participate in their coursework. 5-ER-767:9–769:16, 770:17–771:11, 810:9–812:9, 853:8–13, 873:1–875:6.

- Mr. Payan testified that LACCD denied him the opportunity to independently use LACCD's and LACC's websites to register for courses, apply for financial aid, learn about events on campus, and perform other tasks that sighted students could perform without third-party assistance. 5-ER-827:5–9, 834:25–837:2.

- Mr. Payan testified that he could not fully participate in math and psychology courses that used the inaccessible Etudes and MyMathLab software programs, leading to a significant loss of educational opportunity. 6-ER-978:20–980:5, 981:15–984:24; 5-

ER-762:15–765:25. In particular, he testified that being unable to use functions like practice quizzes, tutorial videos, and a chat room that allowed for exchanges between the professor and students meant that he "was unable to participate." 5-ER-785:6–16, 787:15–788:1.

- Mr. Payan testified that because he is blind, LACCD refused to allow him to take Math 125, instead steering him to a slower course of study that would take double the time to complete, denying him the opportunity to fully participate in its educational programs. 5-ER-771:18–777:6.

Thus, there was ample evidence from which the jury could find that Plaintiffs were harmed by the loss of educational opportunities and full participation in their academic program. The jury's decision to award Mr. Payan significantly more damages than Ms. Mason indicates that it considered the evidence carefully in deciding the amount of damages to award.

### 3. Plaintiffs were not required to assign an economic value to their lost opportunities.

To the extent the district court rejected Plaintiffs' testimony as insufficient simply because none of it assigned an economic value to the harm of lost educational opportunities, the court misunderstood the nonpecuniary nature of lost opportunity damages. Other courts that have recognized the viability of lost

36

opportunity damages in a post-*Cummings* landscape have distinguished these damages from easily quantifiable monetary forms of harm. For example, in *Doe v. Fairfax County School Board*, the court described lost opportunity damages as "not based upon specific monetary harm." 2023 WL 424265, at *5.

Similarly, in *Doe v. University of Mississippi*, the court distinguished economic damages flowing from a school's deprivation of educational benefit to a student (in that case, lost earning capacity), which requires a degree of numerical certainty to prove, from damages for lost educational opportunities, which recognize that "[a] university education has never been only about economic gain." 2024 WL 3011133, at *4–8. Responding to the defendants' argument that the student plaintiff had to "show economic losses resulting from those lost opportunities with reasonable certainty," the court explained that "while *reasonable* certainty is required, juries routinely make equally difficult findings in other contexts, like quantifying monetary damages for sexual harassment under Title IX." *Id.* at *5. In permitting the plaintiff's loss of educational opportunities damages to survive summary judgment, the court found that the plaintiffs' evidence of being suspended from school and having adverse statements on his record—evidence with no corresponding monetary value attached—was sufficient to support this category of damages. *Id.*

In this case, as with proving other types of nonpecuniary damages, Plaintiffs did not need to present evidence of the monetary value of their lost educational opportunities to be compensated for this harm. Courts regularly leave to juries the proper valuation of nonpecuniary compensatory damages, in contexts ranging from reputational harm to frustration of a nonprofit organization's mission. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) (holding that while jury awards for reputational harm "must be supported by competent evidence concerning the injury, . . . there need be no evidence which assigns an actual dollar value to the injury); *Hous. Works, Inc. v. Turner*, No. 00CIV.1122, 2004 WL 2101900, at *34–35 (S.D.N.Y. Sept. 15, 2004) (Nonprofit's "mission non-fulfillment damages" need not be related to any financial loss.), *R&R adopted as mod.*, 362 F. Supp. 2d 434 (S.D.N.Y. 2005).

Requiring Plaintiffs to prove a specific dollar amount to support an award of lost educational opportunities damages also ignores that juries are permitted to rely on common sense when awarding damages. *See Mueller v. Dep't of Pub. Safety*, 595 F. Supp. 3d 920, 930 (D. Haw. 2022) (holding that the jury properly "applied judgment, common sense, and experience to determine the monetary value" of plaintiff's harm); *see also United States v. Doe*, 842 F.3d 1117, 1122 (9th Cir. 2016) ("[A] trier of fact can rely on common sense." (internal quotation marks omitted)); *United States v. Ruiz*, 462 F.3d 1082, 1087 (9th Cir. 2006) (upholding

jury instruction that incorporated reliance on common sense); *Walker v. Endell,* 850 F.2d 470, 475 (9th Cir. 1987) (failure to define a "common sense" term that jurors can understand without further instructions does not violate due process).

### 4.    The jury followed the district court's instructions.

The district court properly instructed the jury that its damages award "must be based upon evidence and not upon speculation, guesswork, or conjecture," *see* 8-ER-1413:20–1414:9, and the jury is presumed to have followed the court's instructions, *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1247 (9th Cir. 2014) (citing *U.S. v. Heredia*, 483 F.3d at 913, 923 (9th Cir. 2007) (en banc)).

The jury here faithfully followed the district court's instructions in awarding damages. Notably, the district court's jury instructions did not restrict the jury to awarding damages only for economic harm for which evidence of monetary valuation had been offered. The district court instructed the jury that "[d]amages means the amount of money that will reasonably and fairly compensate the plaintiff *for an injury* you find was caused by a defendant's violation," that the "award must be based upon the evidence and not upon speculation and guess-work or conjecture," and that "[y]ou *can consider* the testimony of plaintiffs regarding the expenses they incurred and if you find those expenses were the result of a violation of the ADA." 8-ER-1413:20–1414:9 (emphasis added).

39

The jury's award of nonpecuniary lost educational opportunities damages was consistent with these instructions. First, the district court instructed the jury that it could "reasonably and fairly compensate" plaintiffs "for *an injury*" the jury found was caused by Defendant's legal violation—not simply for economic injuries. Second, the instruction that the jury "*can* consider" testimony about expenses Plaintiffs incurred because of Defendant's legal violation was not preclusive. The district court did not instruct the jury that it was limited to awarding damages to compensate *only* for expenses incurred and nothing else (such as nonpecuniary harm from lost educational opportunities).

The district court concluded that the jury had awarded damages unmoored from the evidence largely because it wrote in "+ attorney's fees" next to each award of damages. 1-ER-15. The court's logic here appears to have been that if the jury wrote such a thing—despite not being instructed to do so by the court—then it surely was not paying attention to the court's instructions or the evidence in the case. Yet there is no basis for this dismissive conclusion. First, while the jury was never instructed that it could award attorneys' fees, it also was never instructed that it could not. *See* 8-ER-1401:18–1416:13. Accordingly, the jury did not violate any instruction in adding this language to the verdict form.

Second, the jury's desire to ensure that attorneys' fees were awarded amounts to mere surplusage on the verdict form—not a comment that calls into

doubt any of the jury's findings. *See Hoyle v. Ada Cnty.*, 501 F.3d 1053, 1063 (9th Cir. 2007) (holding that a jury's handwritten annotations on a verdict form may be relevant to clarifying the jury's intent as to the verdict itself, but that surplusage need not be considered). The jury's decision to write in something extra about an issue unrelated to damages provides no basis for throwing out its damages award as unsupported by the evidence.

The trial court is obligated to work to uphold a jury's verdict. *See Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058–59 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 17, 2003). Even with respect to seemingly inconsistent answers on a verdict form, "a trial court has a duty to attempt to harmonize" these apparent inconsistencies, "if it is possible under a fair reading of them." *Id.* (quoting *Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 119 (1963). "To do otherwise results in a collision with the Seventh Amendment." *Id.* (internal quotation marks omitted).

This Court has made clear that the consistency of a jury's verdict must be considered "in light of the instructions given." *Grosvenor Properties, Ltd. v. Southmark Corp.*, 896 F.2d 1149, 1151 (9th Cir. 1990). Here, the jury's verdict is consistent with the district court's instructions to the jury regarding the damages it could award. The district court should not have substituted its own judgment about

41

appropriate damages in this case with that of the jury. The jury's damages award should be reinstated.

### III. The district court's narrow injunction undermines the jury's findings and ignores the evidence.

As the district court acknowledged, courts "must find prospective relief that fits the remedy to the wrong or injury that has been established." 1-ER-2 (quoting *Salazar v. Buono*, 559 U.S. 700, 718 (2010) and citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established.")). Yet the district court's injunction fits only a small fraction of the wrong Plaintiffs proved at trial.

Although the jury found that LACCD violated the ADA in fourteen distinct ways, the district court's injunction was limited to remedying only three problems: the library, websites, and accommodation forms. 1-ER-10. While the injunction also requires LACCD to periodically verify third-party vendors' accessibility assessments, it fails to specify what should happen when an accessibility issue is identified. 1-ER-11.

The district court's injunction leaves unaddressed most of the ADA violations proven at trial. It fails to require the provision of timely, accessible course materials to blind students, even though the jury found LACCD failed at this critical responsibility. 2-ER-136–37 at Qs. 5 & 8; *see also* 5-ER-777:18–782:3, 824:6–825:10, 826:1–827:20; 6-ER-960:1–962:11. Although the jury found

that LACCD repeatedly violated the ADA by failing to honor approved accommodations (such as by disallowing classroom recording and failing to provide agreed-upon notetaking and testing accommodations), the injunction leaves this recurring problem entirely unaddressed. 2-ER-139-140, Qs. 13–16; *Compare* 1-ER-2, *with* 2-ER-108–09 ¶¶ 7–9. While the jury found that LACCD steered Mr. Payan away from certain classes because he is blind on two different occasions, again, the injunction requires nothing of LACCD on this front. 2-ER-140-41, Qs. 17 & 19; *Compare* 1-ER-2, *with* 2-ER-109 ¶ 10.

Despite the jury's finding that LACCD intentionally violated the ADA by using inaccessible course software in Mr. Payan's courses, the injunction contains no mechanism to prevent this repeat problem from recurring (for example, by requiring LACCD to reject procurement of inaccessible course technology or to develop a plan for providing equivalent alternative access to blind students). 2-ER-135–36, Qs. 3 & 4; *Compare* 1-ER-2, *with* 2-ER-108 ¶ 5. The district court even rejected Plaintiffs' request that the injunction require LACCD to follow its own Alternate Media Production Policy, which, if followed, would help prevent recurrence of many of the ADA violations in this case. *Compare* 1-ER-2, *with* 2-ER-106 ¶ 1; *see* 8-ER-1507.

Although the jury found that LACCD violated the ADA in fourteen different ways—most intentionally—the injunction requires no training, expert assistance,

oversight, or reporting to help ensure future compliance. *Compare* 1-ER-2, *with* 2-ER-107, 110–115 ¶¶ 3, 11–17, 20. The district court's rationales for its omissions are incorrect as a matter of law and are based on clearly erroneous factual findings.

### A. The district court offered no explanation for failing to require the timely provision of accessible course materials.

The district court offered no explanation for one of its most glaring omissions: the failure to require that LACCD provide blind students with timely, accessible course materials. *See* 1-ER-2. In response to the jury's findings that LACCD violated the ADA by failing to provide Mr. Payan with accessible class handouts, PowerPoints, and math and psychology textbooks, 2-ER-136–37, Questions 5 & 8, LACCD offered only that accessible versions of these materials "should be"—not *must be*—provided to blind students with "sufficient time." 2-ER-123–22 ¶ 18. LACCD never claimed to require that instructors submit their course materials to OSS far enough in advance of class to allow for timely conversion to accessible formats. *See* 2-ER-117, 6-ER-933, 4-ER-566.

Plaintiffs, by contrast, provided expert testimony from Dr. Gunderson detailing how institutions of higher education can ensure timely provision of accessible course materials for blind students. 2-ER-98, 100–101 ¶¶ 14, 18–20; *see also* 6-ER-1091:1–1094:23, 1096:10–1097:14. The court's failure to explain why it would not order LACCD to remedy its continuing failure to ensure the timely provision of accessible course materials constitutes legal error. *See* Fed. R. Civ. P.

65 ("Every order granting an injunction . . . must . . . state the reasons why it issued.").

### B. The district court erred by refusing to remedy problems implicit in the jury's findings.

The district court erroneously justified its failure to order any changes to LACCD's process for procuring educational technology and its omission of any training requirements on the fact that "the jury neither explicitly nor implicitly determined that Defendant's process in acquiring inaccessible educational software . . . constituted a violation of the ADA" or that "the lack of widespread accessibility training of LACC or LACCD staff amounted to violations of the ADA." 1-ER-5–6.

The district court's rationale is at odds with the very case law it cited in explaining its injunction. *See* 1-ER-3 (noting that the trial judge must follow the "the jury's implicit or explicit factual determinations in deciding equitable claims," and that it is permitted to "reach any interpretation [of the basis of the jury's verdict] that is supported by the evidence") (quoting *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016). Trial courts may make "additional factual findings in determining the proper remedies, so long as they are not inconsistent with the jury's explicit or implicit findings." 1-ER-3 (citing *Burton v. Armontrout*, 975 F.2d 543, 544–45 (8th Cir. 1992)).

The district court incorrectly reasoned that before it could order injunctive relief, the jury was required to identify the causes of LACCD's violations (poor training or inadequate procurement process) as independent violations of the ADA. Yet questions as to the causes of LACCD's ADA violations were not on the verdict form because, on their own, they do not amount to ADA violations. Instead, insufficient training and a procurement process that did not adequately consider accessibility are implicit in—and certainly not at odds with—the jury's findings of widespread intentional violations of the ADA. For example, the line between the jury finding that LACCD had, with deliberate indifference, procured inaccessible technology and the implicit finding that LACCD's procurement process fails to adequately consider accessibility is quite direct.

Courts have ordered mandatory training and the implementation of policies to ensure compliance with the ADA and other civil rights laws, including monitoring of compliance with those policies, in cases where there was no explicit finding that training or current policies were inadequate—only that the defendant had violated the law. *See, e.g.*, *McBride v. Michigan Dep't of Corr.*, 294 F. Supp. 3d 695, 700 (E.D. Mich. 2018) (ordering state department of corrections to provide staff training on working with deaf prisoners and to adopt "effective and comprehensive policies and procedures . . . including for appropriate compliance monitoring"); *see also Allen v. Koenigsmann*, No. 19-CV-8173, 2023 WL

8113230, at *4–5 (S.D.N.Y. Nov. 22, 2023) (issuing an injunction requiring

training of prison staff after bench trial finding Eighth Amendment violations

related to medical care); *Monroe v. Meeks*, 584 F. Supp. 3d 643, 687–88 (S.D. Ill.

2022) (after bench trial finding Eighth Amendment violations, issuing a permanent

injunction requiring the department of corrections to train staff and inmates on

"transgender issues and awareness, including the harm caused by misgendering

and harassment"); *Cole v. City of Memphis,* 108 F. Supp. 3d 593, 598, 611 (W.D.

Tenn. 2015) (following jury's verdict that police force's clearing of street violated

the Fourth and Fourteenth Amendments, entering permanent injunction requiring

"additional training of and dissemination of information among . . . officers"

because it "is the appropriate cure to prevent further violations"), *aff'd sub nom.*

*Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016).[5]

Here, the jury's broad verdict requires remedial measures to ensure that

those violations of the law do not continue, especially since LACCD has failed to

---

[5] Notably, some of these injunctions were issued in the prison context, in which courts are required to view requests for injunctive relief "with great caution so as not to immerse the federal judiciary in the management of [ ] prisons." *Allen*, 2023 WL 8113230, at *3 (alteration in original) (quoting *Barrett v. Maciol*, 20-CV-537 (MAD/DJS), 2022 WL 130878, at *4 (N.D.N.Y. Jan. 14, 2022)). The Prison Litigation Reform Act's requirements that prospective relief be "narrowly drawn" and "extend no further than necessary to correct the violation of the Federal right" further restricts the breadth of injunctive relief in the prison context. 18 U.S.C. § 3626(a)(1)(A)). These restrictions do not apply here. Under the ADA, the district court has the ability to issue broad injunctive relief. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).

demonstrate current compliance. Thus, the district court erred in concluding it could not order training or changes to the procurement process absent the verdict form stating that LACCD's training and procurement practices—rather than the outcomes of those practices—violated the ADA.

### C. The district court improperly relied on LACCD's litigation-motivated changes and its finding—contrary to undisputed expert evidence—that LACCD is now "vigilant to its ADA responsibilities."

The district court rejected Plaintiffs' requests for changes to LACCD's procurement process and training, expert assistance, oversight, and reporting to help ensure future ADA compliance based on its incorrect assumption that LACCD had changed its ways. Although the district court recognized in a footnote that subsequent remedial action "is not sufficient to demonstrate that injunctive relief should not issue," it then noted that it was "satisfied" that its limited injunction would resolve Plaintiffs' problems and that "Defendant is vigilant to its ADA responsibilities." 1-ER-7 n.3. In support of this assumption, the court appeared to rely on its belief that "Defendant has made good faith efforts to make LACC and LACCD more accessible through the redevelopment of the LACC and LACCD website and imposition of the [Equally Effective Alternative Access Plan ("EEAAP")] and continues to do so." 1-ER-7.

First, the changes LACCD claims to have made only occurred years after Plaintiffs filed this lawsuit and after they prevailed at the 2019 trials and again in

2023. *See* 2-ER-120-24 ¶¶ 6 & 20; 2-ER-131 ¶ 5; 6-ER-949:1017, 964:13–965:9,

971:19–22. "It is the duty of the courts to beware of efforts to defeat injunctive

relief by protestations of repentance and reform, especially when abandonment

seems timed to anticipate suit, and there is probability of resumption." *United*

*States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952). Here, LACCD claims to

have changed its policies not to "anticipate" the filing of this lawsuit, but more

than five years after this lawsuit was filed, after two trials, an appeal, and remand

for a new trial. The district court was required to consider LACCD's "extensive

history of violations, since an inference arises from [its] past violations that future

violations are likely to occur," but failed to do so. *United States v. Odessa Union*

*Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987); *see S.E.C. v. Koracorp*

*Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) ("The fact that illegal conduct has

ceased does not foreclose injunctive relief" because although "[p]romises of

reformation and acts of contrition are relevant in deciding whether an injunction

shall issue, . . . neither is conclusive or even necessarily persuasive, especially if no

evidence of remorse surfaces until the violator is caught.").

Had the district court properly considered LACCD's history of violating the

ADA—both in this case and in others—it would have been clear that LACCD

cannot be trusted to self-correct. In addition to its long history of fighting

compliance with the ADA in the present case, LACCD has also required judicial

intervention to ensure compliance in two other ADA cases involving student

access. In *Huezo v. Los Angeles Community College District*, 672 F. Supp. 2d

1045, 1046–47 (C.D. Cal. 2008), after the district court granted summary judgment

on liability under the ADA and Section 504 to an LACCD student who could not

access his campus in his wheelchair, it referred the parties to mediation. After more

than a year of negotiations, however, the student continued to encounter access

barriers and LACCD refused to provide any concrete plans for fixing the situation.

*Huezo*, 672 F. Supp. at 1047. Accordingly, the court had to permanently enjoin

LACCD to make the necessary physical changes to ensure access for the student.

*Id.* at 1061–68.

More recently, in *Guerra v. West Los Angeles College*, No. CV 16-6796-

MWF(KSX), 2024 WL 3582320, at *1, 11–13 (C.D. Cal. July 30, 2024), where

LACCD is also a defendant, the district court had to issue injunctive relief under

the ADA and Section 504 to ensure that two LACCD students with mobility

impairments could sufficiently access their campus through transportation services.

In that case, LACCD fought compliance with federal disability rights laws for

nearly eight years. *See Guerra v. W. Los Angeles Coll.*, No. CV 16-6796-MWF

(KSX), 2016 WL 11619872, at *1 (C.D. Cal. Nov. 2, 2016).

The evidence in the present case highlights LACCD's pattern of

disregarding its obligations under the ADA. At trial, the jury heard evidence that

although LACCD has several policies requiring it to test educational software for accessibility before procuring it, ensure that its websites are accessible, and provide accessible course materials to students with disabilities in a timely manner (defined as no later than when their classmates receive these materials), these policies existed only on paper. *See supra* pp. 11-12. LACCD never implemented them—as evidenced both by Mr. Payan's and Ms. Mason's experiences and also by LACCD employees' testimony confirming that no one ever tested technology or websites for accessibility and that the required position of "Dean of Educational Technology," tasked with reviewing all procurement decisions to ensure accessibility, was never even filled. *Id.* Against this backdrop, LACCD's eleventh-hour changes—particularly its adoption of yet another policy on paper (the EEAAP policy)—should not have been accepted as obviating the need for injunctive relief.

Second, in declaring that LACCD was now "vigilant to its ADA responsibilities," 1-ER-7 n.3, the district court ignored the undisputed expert testimony that LACCD's belated, litigation-driven efforts do not in fact resolve the problems causing its repeated ADA violations. In fact, the only two changes the district court cited in support of its conclusion—website redevelopment and adoption of the EEAAP policy—demonstrate that LACCD still does not understand how (or wish) to comply with ADA.

51

Although LACCD claimed to have remediated both the LACCD and LACC websites, the only experts on website accessibility in this case, Mr. Bossley and Dr. Gunderson, tested both websites between June 19 and July 17, 2023—following the jury's verdict—and found multiple serious and critical accessibility issues. 2-ER-56–57 ¶¶ 7, 12–13; 2-ER-66; 2-ER-94–95 ¶¶ 4–5. They also explained why the sole method that LACCD is now using to monitor the accessibility of its websites—automated testing—is wholly insufficient. 2-ER-60–61 ¶ 20 (explaining how automated testing tools capture only about 30% of potential accessibility violations); 2-ER-95–96 ¶¶ 7–8. The court heard no expert testimony to the contrary. *See generally* 6-ER-933–1151; 4-ER-566–737. LACCD's failed efforts to remediate its websites do not establish that it now knows how to comply with the ADA on its own.

Nor does LACCD's new EEAAP process—adopted in fall 2020 (2-ER-124 ¶ 20)—conclusively establish that LACCD will not further violate the ADA. LACCD's EEAAP process is supposed to "require alternate plans for accessibility" when LACCD procures inaccessible technology. 2-ER-124 ¶ 20. As Mr. Bossley explained, however, LACCD's EEAAP process falls short of ensuring blind students an equal opportunity to access the educational benefits of technology in several critical ways. 2-ER-62–63 ¶ 23. There is no clarity on *who* determines the need for an EEAAP or *how* that determination is made. 2-ER-62–63 ¶ 23. LACCD

then relies on third-party vendors to draft the EEAAPs despite their lack of critical contextual knowledge of the setting in which the EEAAP is to be implemented. *Id*. Finally, there is no individual with ultimate responsibility for evaluating and approving EEAAP requests on their merits and for ensuring their successful implementation. *Id.*; *see also* 6-ER-960:19–22 (LACCD's witness testifying that she is unaware of any follow-up LACCD undertakes to ensure the EEAAP is properly implemented). LACCD's new process thus consists of outsiders creating a plan for how blind LACCD students will gain equal access to inaccessible digital materials, and has no objective criteria, approval process, or oversight to ensure proper implementation.

With both the websites and the EEAAP process, the only expert testimony on LACCD's litigation-driven changes came from Plaintiffs' experts—both of whom opined they were inadequate to provide blind students an equal opportunity to access content. LACCD offered no expert testimony in rebuttal. *See generally* 4-ER-566–737. Accordingly, there was no basis for the district court to find that LACCD's belated efforts demonstrated vigilance to its obligations under the ADA. If anything, LACCD's misguided and failed changes further underscore the need for injunctive relief.

53

### D. The district court erroneously deemed certain ADA violations isolated incidents when the evidence showed otherwise.

The district court refused to include terms in the injunction that it believed were designed to remedy what it erroneously deemed "single incidents" of ADA violations (steering away from classes and failure to honor approved accommodations such as notetaking, permitting Mr. Payan to record classes, and testing accommodations). Rather than being "single incidents," however, the record showed that they are part of a pattern and practice of excluding blind students from certain courses and failing to honor approved accommodations.

The jury found that LACCD refused to allow Mr. Payan to take Math 125, and that it did so intentionally. 2-ER-140 Q.17. The jury also determined that LACCD intentionally denied both Mr. Payan and Ms. Mason their approved testing accommodations. 2-ER-139–40, Qs. 15 & 16. This latter violation, alone, was not a one-time mistake; Mr. Payan and Ms. Mason testified about having to take exams without their approved accommodations on at least four different occasions. 5-ER-803:12–805:1, 803:7–804:15, 816:20–818:1, 834:4–24, 871:1–872:25.

Rather than just isolated, accidental, "single incidents," the jury found that LACCD violated the ADA on these occasions with, at the very least, deliberate indifference. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that

likelihood." *Duvall*, 260 F.3d at 1139. The deliberate and repeated nature of the ADA violations the court deemed "single incidents," demanded an injunctive remedy, *see* 2-ER-109–10 (Plaintiffs' proposed injunction), along with more comprehensive measures to provide training, expert assistance, oversight, and reporting to change the underlying problems that led to LACCD intentionally violating the ADA, 2-ER-111–16.

The district court dismissed the significance of the jury's deliberate indifference findings by noting that the jury only found deliberate indifference from the period of 2015 to 2018. 1-ER-7. Given the procedural posture and four-year delay between the first time this case was tried in May and June 2019 and the May 2023 trial, the case the jury heard was limited to events that occurred between 2015 and 2018. In addition, the court prohibited representatives of NFB and NFB of California from testifying at the trial about complaints their organizations had received from other blind LACCD students. *See* 9-ER-1533:2–21, 1543:10–1544:15.

Although district courts have broad discretion to fashion injunctive relief, that "discretion is not unbounded, particularly as to allegations of misconduct raised after a complaint is filed." *Armstrong v. Newsom*, 58 F.4th 1283, 1292 (9th Cir. 2023). Here, one of the discriminatory steering violations the jury found (from Mr. Payan's section of Statistics 227) occurred in Spring 2018 (5-ER-827:22–

832:25; 2-ER-141, Q. 19), well after Plaintiffs filed the complaint in March 2017.

3-ER-531.

Moreover, the evidence showed that six years after this case was filed, and

after three trials, LACCD still does not guarantee provision of a notetaker for blind

students for whom this accommodation is approved. 4-ER-600:5–602:6. Nor has it

bothered to take any measures to ensure that test taking accommodations for blind

students are being provided as promised. 4-ER-603:17–604:2. The repeated and

intentional nature of LACCD's ADA violations that the district court deemed

"single incidents," as well as LACCD's repeated failure to correct the problems,

well after the filing of this lawsuit, required injunctive relief to cure.

**E.  The district court improperly minimized the substantial findings of ADA violations in refusing to order robust training, assistance, and accountability measures to ensure future ADA compliance.**

The district court also rejected Plaintiffs' requests for training, expert

assistance, oversight, and periodic reporting for fear that this would enmesh

Plaintiffs and the district court "too deeply into the affairs of LACC and LACCD."

1-ER-6. Yet where, as here, LACCD has displayed a broad pattern of violating the

ADA, with deliberate indifference, and the trial evidence showed it failed to follow

its own policies, *see supra* pp. 11-12, injunctive relief in the form of additional

oversight and reporting is required. *See, e.g.*, *United States v. Laerdal Mfg. Corp.*,

73 F.3d 852, 857 (9th Cir. 1995) (finding that defendant's "ongoing history of not

following its own stated reporting procedures made *necessary* not only the statutory injunction, but regular government inspections specifically aimed at determining whether [defendant] is actually following its new stated procedures" (emphasis added)). As the Supreme Court has noted, in the context of local school districts, "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*, 402 U.S. at 15. In particular, when resolving "a claim brought under a federal statute intended to combat discrimination . . . the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 873 (9th Cir. 2017) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)).

It is of no import that the jury only heard from three blind individuals about their repeated experiences of being denied an equal educational opportunity at LACCD. *See* 1-ER-7 n.2. "[I]f the injury is the result of violations . . . that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), then system–wide relief is required." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1072–73 (9th Cir. 2010) (alteration and citation omitted). As this Court has held, ADA plaintiffs "need not

necessarily have personally encountered all the barriers" that denied them access "in order to seek an injunction to remove those barriers." *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002); *see also Kirola v. City & Cnty. of San Francisco*, No. 21-15621, 2023 WL 2851368, at *1 (9th Cir. Apr. 10, 2023) (holding that district court's denial of injunctive relief based on belief that relief was limited to only those barriers the individual plaintiff personally encountered took "too narrow a view of injunctive relief under the ADA"); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011) (en banc).

Here, there was ample evidence that the cause of the numerous ADA violations Ms. Mason and Mr. Payan experienced, as well as those witness Sylvia Mitchell testified about, were systemic in nature. These blind students repeatedly lacked access to timely, accessible course materials because LACCD failed to implement a proactive process for this. *See, e.g.*, 3-ER-519:1–520:18 (LACCD's Rule 30(b)(6) testifying that: (1) LACCD provides accessible course syllabi to blind students by waiting for them to receive them in class and then bring them to OSS for conversion to an accessible format; and (2) LACCD has no knowledge of whether it has policies regarding when classroom handouts should be sent for conversion to accessible formats, the provision of accessible assignments to students, or whether faculty are required to provide materials for conversion to

accessible formats before the materials are used in class) (video deposition played at trial).[6]

Moreover, this Court has held that opinions from plaintiffs' experts' that the defendants' "accountability systems were inadequate systemwide," support additional injunctive relief. *Armstrong v. Newsom*, 58 F.4th 1283, 1294 (9th Cir. 2023). Here, Mr. Bossley's opinions that LACCD failed to have the required training, internal accessibility complaint or resolution processes, or appropriate exceptions policies necessary to ensure accessibility support the need for broader injunctive relief. *See* 2-ER-61–63 ¶¶ 21–24.

Plaintiffs' request for relief that is systemic in nature does not render it "more burdensome than necessary to redress the complaining parties" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). To the contrary, the only way to ensure that Plaintiffs, including members of the Plaintiff organizations, the NFB and NFB of California, will not be subject to further discrimination is by requiring changes to the policies and practices that led to the multitude of ADA violations in this case.

Nor does Plaintiffs' requested injunctive relief raise a federalism problem by imposing too much on a state actor. This Court has previously upheld far more intrusive and broad injunctions against state and local actors where necessary to correct a track record of violations of federal law. *See, e.g.*, *Melendres v. Skinner*,

---

[6] *See* 6-ER-946:17-19; 2-ER-209–10.

113 F.4th 1126, 1131, 1140 (9th Cir. 2024) (affirming injunction vesting monitor with authority to oversee and revise sheriff's office's complaint intake and routing, "establish policy decisions pertaining to backlog reduction," and determine the need for and implement training, among other provisions); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1092, 1098 (9th Cir. 2010) (upholding district court's order appointing receiver to take over delivery of medical care from head of state prison system, even where Prison Litigation Reform Act requires that injunctions be "narrowly drawn"); *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1492-93 (9th Cir. 1986) (affirming injunction requiring state agency either "to draft a policy on the disciplining of handicapped students that complies with [federal law] or to develop a procedure for monitoring the compliance of local educational agencies" because of evidence that "this gap in state policy contributed to the violation of the plaintiffs' rights"), *aff'd as modified sub nom. Honig v. Doe*, 484 U.S. 305 (1988).

Indeed, a district court in this Circuit previously ordered LACCD—in the context of an ADA claim brought by a single student—to submit to monitoring (at LACCD's expense and with quarterly reporting) and to hire an ADA access expert, approved by the plaintiff, to oversee accessibility improvements campus-wide. *Huezo*, 672 F. Supp. 2d at 1063–64, 1067. The same district court recently ordered LACCD and one of its campuses, West Los Angeles College ("WLAC"), again in

the context of an ADA claim, to provide transportation assistance to two students with disabilities. *Guerra*, 2024 WL 3582320, at \*11, 13. The court acknowledged that its injunction "would benefit individuals beyond the individual plaintiffs in this case." *Id.* at \*11. Yet it quoted this Court's decision in *Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987) in explaining that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit – even if it is not a class action – if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* (quoting *Bresgal*, 843 F.2d at 1170–71). Given the breadth and nature of LACCD's ADA violations in the present case, the need to order similarly robust injunctive relief here is at least as compelling as it was in *Huezo* and *Guerra*.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision reducing the jury's damages award and reinstate the jury's award. This Court should also reverse the district court's injunction and remand this case for imposition of an injunction that sufficiently remedies all of the wrongs found by the jury, including their underlying causes.

Dated: November 1, 2024   Respectfully submitted,

          /s/ Jessica P. Weber
          Jessica P. Weber
          Kevin D. Docherty
          Monica R. Basche
          BROWN, GOLDSTEIN & LEVY, LLP
          120 E. Baltimore Street, Suite 2500
          Baltimore, Maryland 21202
          Tel: (410) 962-1030
          Fax: (410) 385-0869
          jweber@browngold.com
          kdocherty@browngold.com
          mbasche@browngold.com

          Patricia Barbosa
          BARBOSA GROUP
          606 Lake St. No. 9
          Huntington Beach, California 92648
          pbarbosa@barbosagrp.com

          *Counsel for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s) 24-1809**

I am the attorney or self-represented party.

**This brief contains 13,621 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Jessica P. Weber_____ **Date** ___11/1/2024_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

63

**ADDENDUM**

## TABLE OF CONTENTS – ADDENDUM

42 U.S.C. § 12101 ...................................................................................Add. 1

42 U.S.C. § 12133 ...................................................................................Add. 3

28 C.F.R. Pt. 35, App. A ..........................................................................Add. 4

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos) |

42 U.S.C.A. § 12101

§ 12101. Findings and purpose

Effective: January 1, 2009

Currentness

**(a) Findings**

The Congress finds that--

**(1)** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

**(2)** historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

**(3)** discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

**(4)** unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

**(5)** individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.          1

**(6)** census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

**(7)** the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

**(8)** the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

**(b) Purpose**

It is the purpose of this chapter--

**(1)** to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

**(2)** to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

**(3)** to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

**(4)** to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

**CREDIT(S)**

(Pub.L. 101-336, § 2, July 26, 1990, 104 Stat. 328; Pub.L. 110-325, § 3, Sept. 25, 2008, 122 Stat. 3554.)

Notes of Decisions (263)

42 U.S.C.A. § 12101, 42 USCA § 12101
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

End of Document      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 12133. Enforcement, 42 USCA § 12133

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter II. Public Services (Refs & Annos)
        Part A. Prohibition Against Discrimination and Other Generally Applicable Provisions

42 U.S.C.A. § 12133

§ 12133. Enforcement

Currentness

The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

**CREDIT(S)**

(Pub.L. 101-336, Title II, § 203, July 26, 1990, 104 Stat. 337.)

Notes of Decisions (857)

42 U.S.C.A. § 12133, 42 USCA § 12133
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add. 3

> Code of Federal Regulations
> > Title 28. Judicial Administration
> > > Chapter I. Department of Justice
> > > > Part 35. Nondiscrimination on the Basis of Disability in State and Local Government Services (Refs & Annos)

28 C.F.R. Pt. 35, App. A

APPENDIX A TO PART 35—GUIDANCE TO REVISIONS TO ADA REGULATION ON NONDISCRIMINATION ON THE BASIS OF DISABILITY IN STATE AND LOCAL GOVERNMENT SERVICES

Effective: March 15, 2011

Currentness

Note: This Appendix contains guidance providing a section-by-section analysis of the revisions to 28 CFR part 35 published on September 15, 2010.

Section–By–Section Analysis and Response to Public Comments

This section provides a detailed description of the Department's changes to the title II regulation, the reasoning behind those changes, and responses to public comments received on these topics. The Section–by–Section Analysis follows the order of the title II regulation itself, except that, if the Department has not changed a regulatory section, the unchanged section has not been mentioned.

\*\*\*

Subpart F—Compliance Procedures

\*\*\*

Section 35.172 Investigations and compliance reviews.

In the NPRM, the Department proposed a number of changes to language in § 35.172 relating to the resolution of complaints. Subtitle A of title II of the ADA defines the remedies, procedures, and rights provided for qualified individuals with disabilities who are discriminated against on the basis of disability in the services, programs, or activities of State and local governments. 42 U.S.C. 12131–12134. Subpart F of the current regulation establishes administrative procedures for the enforcement of title II of the ADA. 28 CFR 35.170–35.178. Subpart G identifies eight "designated agencies," including the Department, that have responsibility for investigating complaints under title II. See 28 CFR 35.190(b).

The Department's 1991 title II regulation is based on the enforcement procedures established in regulations implementing section 504. Thus, the Department's 1991 title II regulation provides that the designated agency "shall investigate each complete complaint" alleging a violation of title II and shall "attempt informal resolution" of such complaint. 28 CFR 35.172(a). The full range of remedies (including compensatory damages) that are available to the Department when it resolves a complaint or resolves issues raised in a compliance review are available to designated agencies when they are engaged in informal complaint resolution or resolution of issues raised in a compliance review under title II.

In the years since the 1991 title II regulation went into effect, the Department has received many more complaints alleging violations of title II than its resources permit it to resolve. The Department has reviewed each complaint that the Department has received and directed its resources to resolving the most critical matters. In the NPRM, the Department proposed deleting the word "each" as it appears before "complaint" in § 35.172(a) of the 1991 title II regulation as a means of clarifying that designated agencies may exercise discretion in selecting title II complaints for resolution.

Many commenters opposed the removal of the term "each," requesting that all title II complaints be investigated. The commenters explained that complaints against title II entities implicate the fundamental right of access to government facilities and programs, making an administrative enforcement mechanism critical. Rather than aligning enforcement discretion of title II complaints with the discretion under the enforcement procedures of title III, the commenters favored obtaining additional resources to address more complaints. The commenters highlighted the advantage afforded by Federal involvement in complaint investigations in securing favorable voluntary resolutions. When Federal involvement results in settlement agreements, commenters believed those agreements are more persuasive to other public entities than private settlements. Private litigation as a viable alternative was rejected by the commenters because of the financial limitations of many complainants, and because in some scenarios legal barriers foreclose private litigation as an option.

Several of those opposing this amendment argued that designated agencies are required to investigate each complaint under section 504, and a departure for title II complaints would be an inconsistency. The Department believes that § 35.171(a) of the final rule is consistent with the obligation to evaluate all complaints. However, there is no statutory requirement that every title II complaint receive a full investigation. Section 203 of the ADA, 42 U.S.C. 12133, adopts the "remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973" (29 U.S.C. 794a). Section 505 of the Rehabilitation Act, in turn, incorporates the remedies available under title VI of the Civil Rights Act of 1964 into section 504. Under these statutes, agencies may engage in conscientious enforcement without fully investigating each citizen complaint. An agency's decision to conduct a full investigation requires a complicated balancing of a number of factors that are particularly within its expertise. Thus, the agency must not only assess whether a violation may have occurred, but also whether agency resources are best spent on this complaint or another, whether the agency is likely to succeed if it acts, and whether the particular enforcement action requested best fits the agency's overall policies. Availability of resources will always be a factor, and the Department believes discretion to maximize these limited resources will result in the most effective enforcement program. If agencies are bound to investigate each complaint fully, regardless of merit, such a requirement could have a deleterious effect on their overall enforcement efforts. The Department continues to expect that each designated agency will review the complaints the agency receives to determine whether further investigation is appropriate.

The Department also proposed revising § 35.172 to add a new paragraph (b) that provided explicit authority for compliance reviews consistent with the Department's longstanding position that such authority exists. The proposed section stated, "[t]he designated agency may conduct compliance reviews of public entities based on information indicating a possible failure to comply with the nondiscrimination requirements of this part." Several commenters supported this amendment, identifying title III compliance reviews as having been a successful means for the Department and designated agencies to improve accessibility. The Department has retained this section. However, the Department has modified the language of the section to make the authority to conduct compliance reviews consistent with that available under section 504 and title VI. See, e.g., 28 CFR 42.107(a). The new provision reads as follows: "(b) The designated agency may conduct compliance reviews of public entities in order to ascertain whether there has been a failure to comply with the nondiscrimination requirements of this part." The Department has also added a provision to § 35.172(c)(2) clarifying the Department's longstanding view that agencies may

obtain compensatory damages on behalf of complainants as the result of a finding of discrimination pursuant to a compliance review or in informal resolution of a complaint.

Finally, in the NPRM, the Department proposed revising the requirements for letters of findings for clarification and to reflect current practice. Section 35.172(a) of the 1991 title II regulation required designated agencies to issue a letter of findings at the conclusion of an investigation if the complaint was not resolved informally, and to attempt to negotiate a voluntary compliance agreement if a violation was found. The Department's proposed changes to the 1991 title II regulation moved the discussion of letters of findings to a new paragraph (c) in the NPRM, and clarified that letters of findings are only required when a violation is found.

One commenter opposed the proposal to eliminate the obligation of the Department and designated agencies to issue letters of finding at the conclusion of every investigation. The commenter argued that it is beneficial for public entities, as well as complainants, for the Department to provide a reasonable explanation of both compliance and noncompliance findings.

The Department has considered this comment but continues to believe that this change will promote the overall effectiveness of its enforcement program. The final rule retains the proposed language.

***

**Credits**

[Order No. 3180–2010, 75 FR 56184, Sept. 15, 2010; 76 FR 14385, 13286, March 11, 2011]

SOURCE: 56 FR 35716, July 26, 1991; 75 FR 56177, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53223, Aug. 11, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12134, 12131, and 12205a.

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

---

**End of Document**      © 2024 Thomson Reuters. No claim to original U.S. Government Works.